Filed 11/13/20  In re M.F. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re M.F., et al., Persons Coming Under the Juvenile Court Law. | B300513 <br><br> (Los Angeles County Super Ct. No. 19CCJP02818AB) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.F., <br><br> Defendant and Appellant. | |

APPEAL from the orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Earvin F. (Father) appeals from the juvenile court's disposition orders requiring him to participate in parenting classes and submit to on-demand drug testing upon the Los Angeles County Department of Children and Family Services' (Department) reasonable suspicion of his drug abuse. Father contends the juvenile court abused its discretion in making those orders. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Shana S. (Mother) and Father have two children: a 10-year-old son, E.F., and a 13-year-old daughter, M.F.

A. *April 30, 2019 Incident and the Department's Investigation*

On April 30, 2019, the Department received a report that, while shopping with E.F. and M.F., Mother was stealing merchandise. The police reported that store employees recognized Mother from a previous theft incident. In the current incident, a store employee stated that the children were "stuffing items in their pants." When the store staff tried to stop Mother at the exit, "[M]other pulled out a knife and threaten[ed] to harm them if they continued to follow them to the car." According to the police report, "When the [store] staff attempted to stop the car, [M]other attempted to run them over with the car." The police arrested Mother and charged her with robbery (Pen. Code, § 211), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and child endangerment (Pen. Code, § 273a, subd. (a).)

2

Although E.F. and M.F. were not injured, the officers noted that E.F., M.F. and Mother's two nieces were "squished" together in the backseat without car seats or seatbelts. The police took E.F. and M.F. into custody. The police told the Department "that there [was] video of [M]other and children stealing from the store and [M]other threaten[ing] the staff with a knife."

During interviews with the Department, E.F. and M.F. denied stealing from the store. E.F. stated that "he wants to go stay with [Father]." M.F. also "stated that she wants to go home to [F]ather." In her interview with the Department, Mother denied stealing or asking the children to steal from the store, and claimed she pulled out a knife when a store employee "push[ed]" M.F. According to Mother, "[T]hat [was] when she got upset [and] pull[ed] out the knife and threaten[ed] to cut him if he touche[d] her children." Mother stated, "I went crazy because of my domestic violence history when a man put his hands on my daughter." Mother reported that she and Father "were in a relationship for 18 years and the relationship ended about 3 years ago when [Father] went to prison for domestic violence." Mother also told the Department "that there [was] a 10 year/current restraining order that protect[ed] her from [Father]." Mother told the social worker that, despite her "up and down relationship" with Father, the children loved him, he was a "good provider" for them, "they will be safe with him," and "it would be best for the child[ren] to remain in [F]ather's care."

Father told the Department that "he [did] not know what's going on with [Mother]" or "anything about the children stealing from a store." Father stated, "[H]e love[d] his children" and "want[ed] custody of his children." Father told the Department, "He [saw] his children every day and that he [made] sure they

[went] to school and he pick[ed] them up from school." Father stated that "there [was] plenty of food and clothing for the children at [his] home" and that his family "also love[d] the children very much."

Father disclosed "a past history with [M]other involving domestic violence but the matter has been resolved." Father stated he had proof of completion of domestic violence classes and denied involvement in any criminal activity since 2017.[1] Father told the Department "that he will not allow [M]other to visit the children without [Department] approval." The social worker observed that Father "appeared sincere and concerned about the safety and wellbeing of his children." The Department placed E.F. and M.F. with Father in his home.

B.      *Dependency Petition and Detention Hearing*

The Department filed a petition on May 3, 2019, alleging juvenile court jurisdiction over E.F. and M.F. pursuant to Welfare and Institutions Code[2] section 300, subdivision (b)(1). Based on the April 30 events, the Department alleged that Mother "endanger[ed] the children's physical health and safety, and place[d] the children at risk of serious physical harm, damage and danger." At the May 6, 2019 detention hearing, Mother entered a general denial, and Father submitted to the juvenile

---

[1]      Father has criminal convictions spanning a 20-year period for theft; possession of a firearm; possession of a controlled substance; possession of a narcotic; and willful infliction of corporal injury on a spouse or cohabitant. Father "is required to register as a controlled substance abuse offender."

[2]      Statutory references are to the Welfare and Institutions Code.

4

court's jurisdiction. Mother's counsel stated, Mother "[was] happy that [M.F.] and [E.F. were] living with their Father." The children's counsel submitted "on release to Father, detention from Mother." After finding a prima facie case for detaining E.F. and M.F. from Mother, the juvenile court placed the children with Father under the Department's supervision. The juvenile court also ordered the Department to provide family maintenance services for Father and family reunification services, monitored telephonic contact during incarceration, and monitored visitation upon release from custody for Mother.[3] The juvenile court scheduled the jurisdiction and disposition hearing for June 13, 2019.

    C.    *Jurisdiction and Disposition Hearing*

        1.    *The Department's Jurisdiction and Disposition Report*

At Father's home, the Department observed E.F. and M.F. appropriately dressed in their school uniforms. The children reported that "they [felt] safe with [M]other and [F]ather." However, while talking with the social worker, the children "seemed apprehensive at times" because "there were various adult individuals coming in and out of the house, backyard and converted garage." The Department reported "that there seems to be numerous adults in/out of the father's home that have not been assessed and [Father] has refused to provide their information." The Department reported that, while Father appeared to be providing the children with "basic necessities," the children's "living conditions [were] marginal." Father and the children lived in a one-room addition to the paternal

---

[3]     Mother was released from jail on July 23, 2019.

5

grandmother's home. The Department "observed maggots on the couch/ottoman that is located inside the home." The Department also "observed the room and surrounding area to be infested with flies as the room was messy with clothes and old food throughout." The backyard contained "a working deep freezer full of food." The yard also had "an extensive amount of trash" and "old canned food," as well as two "non-working cars with shattered windows and full of various items," a pit bull chained on each side of the backyard, and a third pit bull chained in the front yard. The dogs needed veterinary care.

The Department "observed [Father] to have the following items in their family living area: razor blades and syringes on the TV table, and several backpacks full of medications." Father told the Department that he is "retired" and that "he receives social security for his medical conditions." However, "[Father] declined to provide any details as to his condition or if he took any medications for a mental health condition." The Department expressed the "concern that [Father was] using substance or his medical conditions [were] inhibiting his ability to maintain a safe and clean environment for the children." Because of his "criminal history related to possession of a controlled substance," the Department requested that the juvenile court order Father "to submit to an on-demand test to rule out substance use." Pending completion of its investigation regarding Father, the Department stated it was "deferring recommendations."

During his interview, Father "denied having concerns about [M]other's ability to parent the children" and stated "she [was] a good mother." The children had "excessive" school "tardies."

## 2. *June 13, 2019 Hearing*

At the June 13, 2019 jurisdiction and disposition hearing, arguing that "Mother was trying to protect her children" and that "she never placed her children at risk of harm," Mother's counsel asked the court to dismiss the petition. The juvenile court sustained the petition and found E.F. and M.F. to be persons described by section 300. The court found that Father submitted to the juvenile court's jurisdiction. The Department's counsel referenced its concerns regarding Father's criminal drug history, the "razor blades and syringes" and "several back packs full of medications" in the living area, Father's refusal to provide his "medical/medication history," and the children's "marginal" living conditions. Father's counsel responded, because "Father takes insulin," "there were syringes" in the home. His counsel also stated that only Father and the two children lived with him. Regarding drug testing, Father's counsel argued, "Father may have a history, but there's nothing to show that he has any sort of substance abuse problem. If the court is suspicious, if they have any good, credible evidence that he may be using, then, of course, they can test him. But I don't think there's any basis. . . . I don't think he should be ordered to test unless there's reasonable suspicion that he's using."

Based on the Department's request for a continuance, the juvenile court ordered the Department to assess Father's home, stating "unless there's any kind of suspicion that [Father] is under the influence, I'm not going to order testing. But if there is, I'm ordering testing." The court ordered Father "to cooperate with the Department." The juvenile court continued the disposition hearing to August 13, 2019.

7

D.    *Disposition Hearing*

   1.    *The Department's Last Minute Information Report*

During an unannounced visit to Father's home on July 25, 2019, the Department observed "birds eating maggots in the dirt area that is near the entrance to the family home" and a fly infestation in the deep freezer full of food. However, the social worker reported, "[T]he home appeared to be cleaner than during her previous visit." After a home visit on August 12, 2019, the Department reported "that the amount of flies in and around the home seemed to have reduced." The Department did not observe "any maggots in and around the home." However, Father "continue[d] to store his medications in a backpack that is accessible to the children," and "a lot" of unassessed adults continued to pass through the home.

After the home visits, the Department expressed "concern that [Father was] unwilling or unable to consistently maintain a clean and sanitary home environment for the children." The Department also reported concern that "[Father was] not accessing or following through with the services and supports provided to him," such as a "back to school giveaway event" and a "summer park/rec program" for the children. Father told the Department, "[E.F. and M.F.] didn't want to go." The "children reported that they have been sleeping or playing on their phone all summer."

   2.    *August 13, 2019 Hearing*

At the August 13, 2019 continued disposition hearing, regarding the Department's recommendation that Father attend parenting classes, Father's counsel contended, "[Father] is a nonoffending parenting. . . . [A court] may not order

nonoffending parents to participate in any programming, including parenting, absent a showing that the parent or minor will benefit for the participation, is a necessary tool to avoid the risk of any future neglect or abuse by the parent. . . . There's nothing to show that it rises itself to the level that he needs to do parenting. . . . The house was much cleaner. . . . This, in and of itself, is not jurisdictional. They did not allege. They didn't amend." Moreover, as to the Department's request for drug testing, Father's counsel argued, "He keeps his medication in the back. There was nothing in there that was found that was anything but for use of the medication he takes. [The Department] never filed anything. They investigated. There was no amended petition that came." Adding that Father's "cooperation has not been very good" and the circumstances "justified" the orders sought, the Department submitted on its reports.

The juvenile court detained E.F. and M.F. from Mother and released them to the home of Father under the Department's supervision. After ordering services for Mother, the juvenile court ordered Father to participate in parenting classes and "to submit to on demand drug testing, on reasonable suspicion of drug use."

Father timely appealed.

## DISCUSSION

Father argues the juvenile court abused its discretion by ordering him to participate in parenting classes and submit to on-demand drug testing on reasonable suspicion of drug use.

9

A.    *Applicable Law and Standard of Review*

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)  Under section 362, subdivision (d), "[t]he juvenile court may direct any reasonable orders to the parents . . . of the child who is the subject of any [dependency] proceedings . . . as the court deems necessary and proper to carry out [the provisions of] this section," including orders to participate in "a parent education and parenting program."  "[A] dispositional order may reach both parents, including a nonoffending parent." (*In re D.M.* (2015) 242 Cal.App.4th 634, 639.)  Thus, section 362 "authorizes the juvenile court to require a nonoffending parent to comply with orders pertaining to a child once the court has accepted jurisdiction.  [Citation.]  The court's broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings." (*In re K.T.* (2020) 49 Cal.App.5th 20, 25; see *In re Christopher H.*, (1996) 50 Cal.App.4th 1001, 1008 [juvenile court did not abuse its discretion in ordering a parent to participate in alcohol testing as part of the disposition, even though the parent's alcohol problems did not cause the juvenile court to exercise jurisdiction].)

In *In re Briana V.* (2015) 236 Cal.App.4th 297, the court held:  "[T]here need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order.  [Citation.] . . . ¶ . . . At disposition, the juvenile court is not limited to the content of the sustained petition when it

10

considers what dispositional orders would be in the best interests of the children.  [Citations.]  Instead, the court may consider the evidence as a whole." (*Id.* at p. 311; see *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148 ["[t]he court had jurisdiction over the child.  Accordingly, it had the authority to order a nonoffending parent to participate in services"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["[a] jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"].)

We review the juvenile court's disposition orders for abuse of discretion.  (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652.) "In reviewing an order for abuse of discretion, we '"must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling.  [Citation.]  The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child.'"  [Citation.]  'The trial court is accorded wide discretion and its determination will not be disturbed on appeal absent "a manifest showing of abuse."'"  (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186-187; accord, *In re Neil D.* (2007) 155 Cal.App.4th 219, 225; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

> B.    *The Juvenile Court Did Not Err in Ordering Father To Participate in Parenting Classes and Submit to Drug Testing*
>
> 1.    *Parenting Classes*

The juvenile court did not abuse its discretion in ordering Father to participate in parenting classes.  The Department reasonably questioned Father's ability to maintain a sanitary and

safe environment for E.F. and M.F.  The Department observed safety and health hazards in and around Father's home including maggots, fly infestation, shattered windows and accessible medications, razor blades, and syringes.  The presence of medications, razor blades, and syringes in the living area created a risk of harm to E.F. and M.F.  Father had the ability to minimize these risks.  The unassessed adults coming in and out of the home made the children "apprehensive."  E.F. and M.F. also had excessive school tardies and slept or played on their phones all summer.  The juvenile court could have reasonably concluded that Father's participation in parenting classes would have advanced the children's best interests.  The juvenile court's order was within its discretion.  (See *In re Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 474 ["[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal, this determination cannot be reversed absent a clear abuse of discretion"]; see generally *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [""[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"""].)

Father's reliance on *In re Jasmin C.* (2003) 106 Cal.App.4th 177 is misplaced.  In *In re Jasmin C.*, the court reversed a dispositional order requiring the mother, who was a "nonoffending" parent under the petition, to complete a parenting education class.  (*Id.* at p. 181.)  The court explained that the department at the dispositional hearing "made no showing and referred to no evidence that supported" the parenting class

condition, the juvenile court imposed the condition "without making any findings or giving any explanation," and "nothing in the record supported the order, which apparently was based on a rote assumption that [the] mother could not be an effective single parent without parenting classes, something belied by common sense and experience in 21st-century America." (*Id.* at pp. 181-182.) Here, in contrast, the record contains evidence supporting the juvenile court's exercise of discretion to order parenting classes for Father.

### 2. *Drug Testing on Reasonable Suspicion of Drug Use*

Father has a history of substance abuse, has convictions relating to controlled substances, and "is required to register as a controlled substance abuse offender." During unannounced visits, the Department observed "syringes and razor blades on the table" and "several backpacks full of medications" in the living area. The juvenile court ordered Father "to cooperate with the Department. Despite the Department's inquiries, Father refused "to provide any details as to his medical conditions" or what medications were in the backpacks. Father also refused to disclose why there were razor blades and syringes in the living area. Although Father's counsel stated at the June 13, 2019 hearing that Father took insulin, there was no evidence what medications were in the backpacks and why there were razor blades and syringes in the living area. Father also refused to explain why so many adults were "coming in and out" of the home.

Given Father's refusals to disclose any basis for the medications, razors, and syringes, and Father's substance abuse history, including his status as a registered "controlled substance

13

abuse offender," the juvenile court's order requiring Father to submit to a drug test on the Department's reasonable suspicion of drug use was within its discretion.  (See *In re Corrine W.* (2009) 45 Cal.4th 522, 532 ["'[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.  [Citations.]  The court's determination in this regard will not be reversed absent a clear abuse of discretion"]; see generally *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re A.E.* (2008) 168 Cal.App.4th 1, 4.)

In *In re Basilio T.* (1992) 4 Cal.App.4th 155, on which Father relies, the juvenile court included a substance abuse component in the parents' reunification plan, even though "there was nothing in the record to indicate either [parent] had a substance abuse problem." (*Id.* at p. 172.)  The order was based on "the social worker's observation that [mother] behaved somewhat out of the usual and was obsessed with discussing a fortune-making invention." (*Id.* at p. 172.)  Accordingly, the court concluded there was no basis for requiring the parents to participate in a substance abuse program as part of their reunification plan.  (*Id.* at pp. 172-173.)  Here, based on the Department's observations and Father's failures to cooperate, the juvenile court did not abuse its discretion in ordering drug testing on reasonable suspicion of drug use.

14

## DISPOSITION

The juvenile court's August 13, 2019 orders are affirmed.


DILLON, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.